IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **RONALD SHARKEY,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Civil No. 11-217-CJP** |
| | ) | |
| **MICHAEL J. ASTRUE**, | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM and ORDER**

**PROUD, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff Ronald Sharkey is before the Court, represented by counsel, seeking review of the final decision of the Commissioner of Social Security denying him Supplemental Security Income (SSI) benefits.[1]

**Procedural History**

Mr. Sharkey applied for benefits in December, 2006, alleging disability beginning on December 11, 2006. (Tr. 104). The application was denied initially and on reconsideration. After holding a hearing, ALJ Sherwin F. Biesman denied the application for benefits in a decision dated September 25, 2009. (Tr. 16-23). Plaintiff's request for review was denied by the Appeals Council in January, 2011, and the decision of the ALJ became the final agency decision. (Tr. 1).

Administrative remedies have been exhausted and a timely complaint was filed in this Court. Plaintiff filed a motion for summary judgment at Doc. 22.

**Issues Raised by Plaintiff**

---

[1]This case was referred to the undersigned for final disposition upon consent of the parties, pursuant to 28 U.S.C. §636(c). See, Doc. 25.

1

Plaintiff argues that the ALJ erred in the following respects:

1. He failed to develop the record regarding Mr. Sharkey's limitations.

2. He improperly evaluated the opinion of Physician's Assistant (P.A.) Church.

3. His assessment of plaintiff's RFC was not supported by substantial evidence.

4. He failed to explain why he rejected plaintiff's complaints of fatigue.

4. His credibility analysis was legally erroneous.

## **Applicable Legal Standards**

To qualify for SSI, a claimant must be disabled within the meaning of the applicable statutes.[2]  "[S]upplemental security income is not a form of unemployment insurance and is unavailable if any do-able work exists in the national economy, even if other persons with better skills are likely to be hired instead." *Donahue v. Barnhart*, 279 F.3d 441, 443 (7th Cir. 2002).

For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." **42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A).**  A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.  **42 U.S.C. §§ 423(d)(3) and 1382c(a)(3)(C).** "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or

---

[2]The statutes and regulations pertaining to Disability Insurance Benefits (DIB) are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404.  The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416.  For all intents and purposes relevant to this case, the DIB and SSI statutes are identical.  Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations.  Most citations herein are to the DIB regulations out of convenience.

profit. **20 C.F.R. §§ 404.1572.**

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled.  It must be determined:  (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience.  *Schroeter v. Sullivan*, **977 F.2d 391, 393 (7th Cir. 1992); see also, 20 C.F.R. §§ 404.1520(b-f).**

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made.   The scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." **42 U.S.C. § 405(g)**.  Thus, this Court must determine not whether Mr. Sharkey is, in fact, disabled, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made.  **See,** *Books v. Chater*, **91 F.3d 972, 977-78 (7th Cir 1996)** (citing *Diaz v. Chater*, **55 F.3d 300, 306 (7th Cir. 1995)**).  This Court uses the Supreme Court's definition of substantial evidence, i.e, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, **402 U.S. 389, 401 (1971).**

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Brewer v. Chater*, **103 F.3d 1384, 1390 (7th Cir. 1997)**.  However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner.  See, *Parker v. Astrue*, **597 F.3d 920, 921**

(7th Cir. 2010), and cases cited therein.

### The Decision of the ALJ

ALJ Biesman followed the five-step analytical framework described above. He determined that Mr. Sharkey had not been engaged in substantial gainful activity since the alleged onset date, and that he had severe impairments of diabetes, degenerative disc disease of the cervical spine and chronic low back pain. He determined that plaintiff's impairments do not meet or equal a listed impairment.

The ALJ rejected the opinions of P.A. Church and of the state agency consultant who assessed plaintiff's residual functional capacity. He found that Mr. Sharkey had the residual functional capacity to perform a full range of work at the medium exertional level and he therefore was able to perform his past work as a fork lift operator.

### The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by plaintiff.

1.   **Agency Forms**

Mr. Sharkey was born in 1956, and was 50 years old when he allegedly became disabled. (Tr. 116). A previous application for benefits was denied as of October, 2005. (Tr. 116-117).

Plaintiff indicated that he was unable to work because of diabetes and a back injury. He said that he had been having symptoms for some time, and had only recently been diagnosed with diabetes. He said that his vision was blurred and he felt dizzy and tired because his blood sugar was high. (Tr. 121).

He had worked as a forklift operator through Manpower in 2004 and 2005. (Tr. 122). He had also worked as a painter and a carpenter. (Tr. 129). He completed high school and had

4

not been in special education classes. (Tr. 127).

In an Activities of Daily Living Questionnaire, Mr. Sharkey said that lifting his hands over his head made him dizzy. Pain in his low back and tail bone made him unable to stand for long periods of time. He could not bend down. He was not able to sit for long. He could not drive because of dizziness and numbness in his arms. He was unable to do any yard work or household repairs. (Tr. 137-139).

In a later Disability Report, plaintiff said that his diabetes was getting more difficult to control, and he was having more pain, especially in his neck. (Tr. 160). He said that any activity that required him to use him arms in a reaching motion caused excruciating pain in his neck. He sometimes lost his balance while standing. He could not do much of anything. (Tr. 164).

**2.    Evidentiary Hearing**

Plaintiff was represented by an attorney at the evidentiary hearing on June 24, 2006. (Tr. 32). The hearing lasted 21 minutes. (Tr. 32, 43).

At the time of the hearing, Mr. Sharkey was living in a homeless shelter. He had been there for 2 weeks. Before that, he had been living in an abandoned trailer. He had no income and no health insurance (Tr. 33). He did not have a medical card at the time of the hearing. (Tr. 38).

Mr. Sharkey testified that he had a "pinched nerve" in his neck and a "slipped disc" in his lower back. (Tr. 33). He said that he had pain in both his legs and could not walk very far. He only had pain relief when he was "flooded with a lot of medication." (Tr. 33-34). He was able to get pain medication through Carterville Family Practice Center. (Tr. 34).

He was diagnosed with diabetes in November, 2006. He was not always able to get his diabetes medication. At the time of the hearing, he was 6'1" tall and weighed 162.8 pounds. He had lost about 60 pounds in the last 6 months or so; this weight loss was unintentional and his

5

doctors were investigating the cause. He had a CT scan the Saturday before the hearing and was scheduled for an MRI. (Tr. 34-36). At the time of the hearing, he did not have any insulin, but was supposed to go to his doctor's office and get some. He said that "They got to put me on a medical program where I can get all of my medicine through them." (Tr. 39).

The ALJ stated that he would keep the record open for receipt of the records of the CT scan and MRI. (Tr. 41). He then asked the attorney if there was "something else." The following exchange occurred at Tr. 41:

ATTY: Well, I don't want to waste time judge if you're leaning in a certain direction but otherwise I'd like to create record for my client on his residual functional capacity, do you believe that's necessary, I don't believe he could perform–

ALJ: In my opinion, no, the answer's no. I'm 90 percent pretty certain what I'm going to do but those tests you're talking about, the imaging test, that I'd like to see.

ATTY: All right judge.

ALJ: But it's not necessary to [inaudible] residual functional capacity...

After a discussion of possible reasons for plaintiff's dramatic weight loss, the ALJ stated "You don't need to go off on the RFC." (Tr. 42). The hearing was then closed. There was no evidence from a vocational expert. (Tr. 43).

**3.    Medical Records Prior to Alleged Date of Disability**

Mr. Sharkey was involved in an automobile accident in January, 2004. He was diagnosed with cervical and lumbar strain. (Tr. 171-183).

In March, 2004, a sleep study showed that he had sleep apnea. (Tr. 184-190).

In March, 2005, plaintiff went to the emergency room complaining of low back pain and numbness radiating into his legs. He gave a history of back pain since an automobile accident, which had been aggravated by lifting boxes at work over the last 3 weeks. (Tr. 241). He was unable to sit up without severe pain. He was given Naprosyn and told to follow up with a doctor. (Tr. 227-234).

6

### 4. Medical Records After Alleged Date of Disability

In October, 2006, Mr. Sharkey went to the emergency room complaining of low back pain. He was given pain medication and released to follow up with his doctor. (Tr. 300-301). X-rays showed a very mild wedge deformity of T12. (Tr. 292).

Mr. Sharkey followed up for low back pain and radiating numbness in his legs with Community Health & Emergency Services, Inc., at the Cedar Court Clinic location. He was seen there in October and November, 2006. (Tr. 306-309).

Mr. Sharkey went to the emergency room in December, 2006, with a 2 to 3 day history of abdominal pain, nausea and vomiting. He was admitted. He was diagnosed with diabetes, uncontrolled, new onset. (Tr. 284-289).

Mr. Sharkey was seen at Cedar Court Clinic in June and August, 2007. (Tr. 367-370).

In September, 2008, Mr. Sharkey went to the emergency room at Heartland Regional Medical Center because of chest pain and shortness of breath. He was admitted to the hospital. It was determined that he had not had a heart attack and did not have a cardiac issue. However, his diabetes was uncontrolled. He had not been taking his medications because he could not afford them. He was prescribed Glucophage and told to follow up with a primary care physician. (Tr. 435).

Mr. Sharkey filled out an Adult History form on March 13, 2008. He stated that he was homeless. (Tr. 488-489).

Mr. Sharkey was again admitted to Heartland Regional in November, 2008, because of symptoms related to his uncontrolled diabetes and hypertension. He was unable to afford his medications and did not have a primary care physician. It was noted that he would be following up with Carterville Family Practice. A social worker was consulted and plaintiff applied for Medicaid coverage. He was treated with medications and released after 2 days. (Tr. 476).

Thereafter, plaintiff was treated by Dr. Nanni at Carterville Family Practice. In January, 2009, Dr. Nanni noted that he had obtained a medical card. His blood sugar levels were in the 300-400 range. The doctor told him to increase his insulin and to try to keep his sugar levels below 200. The diagnoses were uncontrolled diabetes, insomnia and neuropathy. (Tr. 473).

In February, 2009, Dr. Nanni noted that Mr. Sharkey had tight muscles and palpable spasms in his neck and back. He was given Lidocaine injections. (Tr. 472). In March, 2009, Dr. Nanni noted that plaintiff had not been taking his medications and was confused about them. A medication list was written out on a wallet card for Mr. Sharkey. He had pain in his neck and back. (Tr. 500). In April, 2009, his diabetes was uncontrolled and his blood sugar levels had ranged from the 50s to greater than 300. He complained of neuropathy and dizziness. His insulin regimen was changed. (Tr. 499).

Mr. Sharkey was again admitted to Heartland Regional in July, 2009, with chest pain and symptoms related to uncontrolled diabetes. His fasting blood sugar was 599 on July 29, 2009. The lab report indicates that a normal level is between 70 and 100. (Tr. 517). It was determined that he did not have a heart attack. He had low back pain. It was noted that he had been having abdominal pain and had lost a significant amount of weight. (Tr. 530-533).

**5.     RFC Assessment**

A state agency consultant, Calixto Aquino, M.D., completed a Physical RFC Assessment on March 14, 2007. He determined that plaintiff was capable of light work, i.e., he could frequently lift 10 pounds, occasionally lift 20 pounds, stand and/or walk 6 out of 8 hours and sit for 6 out of 8 hours. He was limited to only occasional postural activities, including climbing stairs, stooping and kneeling. (Tr. 347-354).

**6.     Opinion of Treating Physician's Assistant**

P.A. Shoshana Church treated plaintiff at Cedar Court Clinic. She completed a form on

June 15, 2007, in which she indicated that she had first seen Mr. Sharkey in August, 2006. She said that he had cervical pain with pain and numbness radiating into his right arm. She noted reduced grip strength and restricted range of motion of the cervical spine. She opined that he had serious limitations; for instance, he could only sit and stand/walk for a total of less than 2 hours out an 8 hour day, and could never stoop or crouch/squat. (Tr. 355-360).

7.  **Records submitted after the ALJ's decision**

The record contains medical records that were not before the ALJ. Plaintiff submitted the additional records to the Appeals Council, which considered them in connection with his request for review. See, AC Exhibits List, Tr. 4-5. Thus, the medical records at Tr. 562-639, designated by the Appeals Council as Exhibits 21F and 22 F, were not before the ALJ.

The medical records at Tr. 562 through 639 cannot be considered by this Court in determining whether the ALJ's decision was supported by substantial evidence, since they were not before the ALJ. Records "submitted for the first time to the Appeals Council, though technically a part of the administrative record, cannot be used as a basis for a finding of reversible error." *Luna v. Shalala*, 22 F3d 687, 689 (7th Cir. 1994). The parties have properly omitted any reference to these records in their briefs, and the Court will therefore not summarize them.

## Analysis

Turning to plaintiff's last point first, it is clear that the ALJ failed to properly evaluate Mr. Sharkey's credibility.

ALJ Biesman expressed his credibility findings in the "meaningless boilerplate" language which has been repeatedly criticized by the Seventh Circuit Court of Appeals. He said that "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence

9

and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (Tr. 21).

In *Parker v. Astrue*, 597 F.3d 920, 921-922 (7th Cir. 2010), the Seventh Circuit called that language "meaningless boilerplate" because it does not communicate what weight the ALJ actually gave to the claimant's statements. Here, despite the fact that he believed that plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," the ALJ must have disbelieved almost everything that Mr. Sharkey said about the extent of his symptoms. However, he did not specify which of plaintiff's statements he did not believe, and did not explain why did not believe them. Such an analysis is inadequate. See, *Martinez v. Astrue*, 630 F.3d 693, 694-696 (7th Cir. 2011).

The problem is compounded by the fact that the ALJ rejected Mr. Sharkey's statements to the extent that they did not mesh with his findings as to RFC. This approach "turns the credibility determination process on its head by finding statements that support the ruling credible and rejecting those statements that do not, rather than evaluating the [claimant's] credibility as an initial matter in order to come to a decision on the merits." *Brindisi v. Barnhart*, 315 F.3d 783, 787-788 (7th Cir. 2003).

The determination of a plaintiff's credibility is often critical because the assessment of her ability to work will often "depend heavily on the credibility of her statements concerning 'the intensity, persistence and limiting effects' of her symptoms...." *Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012). The ALJ noted the importance of the credibility determination at Tr. 22. However, the boilerplate language used by ALJ Biesman wrongly "implies that the determination of credibility is deferred until ability to work is assessed without regard to credibility, even though it often can't be." *Bjornson*, 671 F.3d at 645-646.

This Court is not suggesting that the ALJ's use of the above boilerplate language is

necessarily fatal. The ALJ's decision might be upheld had he gone on to support his credibility findings with a sufficient articulation of how the record contradicts the claimant's statements. ALJ Biesman did not do so here.

The ALJ's main reasons for discounting Mr. Sharkey's credibility were that there were "large gaps" in the medical treatment, there was "no significant, ongoing treatment," and Mr. Sharkey was "frequently non-compliant with his medications." (Tr. 21, 22). Here, the ALJ ran afoul of SSR 96-7p, which cautions that "the adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment." SSR 96-7p, 1996 WL 374186, *7.

The medical records contain numerous notations that plaintiff had no insurance and could not afford his medications. In March, 2008, he was homeless. At the time of the hearing, Mr. Sharkey was living in a homeless shelter and had been living in an abandoned trailer prior to that. The ALJ erred in relying on lack of treatment and failure to take medication without considering plaintiff's inability to pay for treatment and prescriptions. See, ***Craft v. Astrue***, **539 F.3d 668, 678-679 (7th Cir. 2008).**

The ALJ also erred in reaching his determination that Mr. Sharkey has the RFC to do a full range of work at the medium range. The RFC determination must be based on evidence in the record. See, **20 C.F.R. § 404.1546(c);** ***Craft v. Astrue***, **539 F.3d 668, 676 (7th Cir. 2008)**. An ALJ errs when he bases his decision on his own "independent medical findings" rather than the medical evidence in the record. ***Rohan v. Chater***, **98 F.3d 966, 970 (7th Cir. 1996)**.

ALJ Biesman rejected the opinions of both the state agency consultant who assessed RFC and P.A. Church. There was no consultative physical examination. After rejecting the only

medical opinions in the record, the ALJ decided that Mr. Sharkey had the ability to perform work at the medium exertional level without any restrictions. Medium work requires "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. A full range of medium work requires standing or walking, off and on, for a total of approximately 6 hours in an 8-hour workday in order to meet the requirements of frequent lifting or carrying objects weighing up to 25 pounds." SSR 83-10, 1983 WL 31251, *6. Further, medium work involves frequent bending and stooping. *Ibid*. The ALJ's decision was devoid of any explanation of how the medical evidence in the record supported a finding that Mr. Sharkey was capable of a full range of medium work.

The ALJ was required to build a "logical bridge" from the evidence to his conclusion. ***Vilano v. Astrue,* 556 F.3d 558, 562 (7th Cir. 2009), and cases cited therein.** His failure to do so means that his decision cannot be upheld.

Plaintiff's other points are related to the credibility and RFC determinations, and do not require separate discussion. With regard to plaintiff's first point, the Court recognizes that the ALJ did not absolutely refuse to allow plaintiff's counsel to question plaintiff regarding his limitations. However, he certainly discouraged counsel from doing so. An evidentiary hearing before a social security ALJ is a "hybrid between the adversarial and inquisitorial models." ***Overman v. Astrue*, 546 F.3d 456, 465 (7th Cir. 2008) [internal citation omitted].** The disability determination is supposed to proceed in an "informal, nonadversary manner." 20 C.F.R. §416.1400(b). As such, it would have preferable for the ALJ not to have discouraged counsel from examining plaintiff and making a record regarding RFC, especially in view of the fact that the hearing lasted only 21 minutes.

Because of the ALJ's errors, this case must be remanded. The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court

believes that Mr. Sharkey was, in fact, disabled or that he should be awarded benefits.  On the contrary, the Court has not formed any opinions in that regard, and leaves those issues to be determined by the Commissioner after further proceedings.

### Conclusion

Plaintiff's Motion for Summary Judgment **(Doc. 22)** is **GRANTED**.

The Commissioner's final decision denying Ronald Sharkey's application for social security disability benefits is **REVERSED and REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of **42 U.S.C. §405(g).**

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**

**DATED:  June 20, 2012.**

s/ Clifford J. Proud
**CLIFFORD J. PROUD**
**United States Magistrate Judge**